THE CITY OF JACKSONVILLE,
a State of Florida municipal corporation,

       Plaintiff,

v.

SHOPPES OF LAKESIDE, INC.,
a Florida corporation; JACKSONVILLE
HOSPITALITY HOLDINGS L.P., a
Delaware limited partnership; CONTINENTAL
HOLDINGS, INC., a Wyoming Corporation,

       Defendants.

_____/

CASE NO.: 3:12-cv-850-J-25MCR

**DISPOSITIVE MOTION**
**ORAL ARGUMENT REQUESTED**

**THE CITY OF JACKSONVILLE'S AMENDED CROSS MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO CONTINENTAL HOLDINGS, INC.,
AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT[1]**

Plaintiff, The City of Jacksonville ("the City"), pursuant to Federal Rule of Civil

Procedure 56, files its Amended Cross Motion for Partial Summary Judgment against

Defendant/Counterclaim-Plaintiff/Third-Party Plaintiff, Continental Holdings, Inc. ("CHI")

specifically as to the issue of corporate successorship ("Amended Motion"), and states:

## I.  INTRODUCTION

This civil action is brought by the City as the owner of Confederate Park and certain

right-of-way properties in Jacksonville, Florida ("City Properties") contaminated by the release

and discharge of hazardous substances and pollutants from the Main Street Manufactured Gas

Plant ("Main Street MGP").  The Main Street MGP operated from approximately 1874 to

approximately 1912 at the corner of Main Street and Orange Street in Jacksonville.  The City

---

[1] The City files this Amended Motion in accordance with the Court's March 7, 2017 Order (Doc. No. 294).

seeks cost recovery pursuant to Sections 107 and 113(g)(2) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§9607 and 9613(g)(2), and damages pursuant to Section 376.313, Florida Statutes ("F.S.").  Defendant CHI is liable under CERCLA and Section 376.313, F.S. as the corporate successor in interest to Jacksonville Gas Company, the sole owner and operator of the Main Street MGP during its entire operating history.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of proving that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In assessing whether the movant has met this standard, a court must view the record and all factual inferences from it in the light most favorable to the party opposing the motion.  *Rooney v. Watson*, 101 F. 3d 1378, 1380 (11th Cir. 1996).

## III.    CERCLA LIABILITY EXTENDS TO CORPORATE SUCCESSORS-IN-INTEREST

CERCLA imposes liability, in part, on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2).  This liability extends to successors-in-interest.  *See North Shore Gas Company v. Salomon, Inc.*, 152 F.3d 642, 649 (7th Cir. 1998) ("[E]very circuit confronted with the question has determined that Congress intended successor liability to apply in the context of CERCLA") (citing *B.F. Goodrich v. Betkoski*, 99 F.3d 505 (2d Cir. 1996); *John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401 (1st Cir. 1993); *United States v. Carolina*

2

*Transformer Co.*, 978 F.2d 832 (4th Cir. 1992); *United States v. Mexico Feed & Seed Co.*, 980 F.2d 478 (8th Cir. 1992); *Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240 (6th Cir. 1991); *Louisiana-Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260 (9th Cir. 1990); *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 91 (3d Cir. 1988)), *overruled on other grounds by Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983 (7th Cir. 2010). The rationale for this view was succinctly described as follows:

> First, Congress intended to provide the federal government with the tools immediately necessary for a swift and effective response to hazardous waste sites. ***Second, Congress intended that those responsible for disposal of chemical poisons bear the cost and responsibility for remedying the harmful conditions they created.***

*Anspec,* 922 F.2d at 1247 (internal citations omitted and emphasis added).

In determining whether an entity is a successor corporation, there is currently a disagreement among the circuits as to whether one looks to state law or federal common law. The Eleventh Circuit, in *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489 (11th Cir. 1996), held that it was appropriate to apply state law over federal common law to determine liability of a limited partner under CERCLA. *Id.* at 1501-02 ("CERCLA does not require that federal law displace state laws governing the liability of limited partners unless these laws permit action prohibited by the Act, or unless 'their application would be inconsistent with the federal policy underlying the cause of action.'") (quoting *Johnson v. Ry. Express Agency*, 421 U.S. 454, 465 (1975) (citing *Anspec*, 922 F.2d at 1249-50)).[2] Consistent with the Eleventh Circuit's opinion in *Redwing Carriers,* Florida corporate law will govern the determination of

---

[2] *Cf. Hudson Ins. Co. v. American Elec. Corp*, 748 F.Supp. 837 (M.D. Fla. 1990). (pre-*Redwing Carriers* case in which the court noted that the doctrine of corporate successor for CERCLA response costs is one of federal common law); *see also* Michael Carter, *Successor Liability Under CERCLA: It's Time to Fully Embrace State Law*, 156 U. PA. L. REV. 767, 786 (2008) (the Eleventh Circuit has "incorporated state law as the rule of decision for CERCLA successor liability.")

successor liability in this action, unless the application of Florida law would result in those responsible for the contamination not bearing the costs and responsibilities for remedying the conditions they created and accordingly would be inconsistent with the federal policy underlying CERCLA.

## IV.   TRADITIONAL RULE OF CORPORATE SUCCESSOR LIABILITY LAW AND ITS EXCEPTIONS IN FLORIDA

The Florida Supreme Court has adopted the traditional corporate law rule that "a corporation that acquires the assets of another business entity does not as a matter of law assume the liabilities of the prior business."  *Corporate Express Office Prod., Inc. v. Phillips,* 847 So. 2d 406, 412 (Fla. 2003) (*citing Bernard v. Kee Mfg. Co.*, 409 So. 2d 1047, 1049 (Fla. 1982).  In both the *Corporate Express* and *Bernard* cases, the Florida Supreme Court recognized four exceptions to the traditional "non-assumption of liability" corporate law rule, where:

1. the successor expressly or impliedly assumes the obligations of the predecessor; or
2. the transaction is a de facto merger; or
3. the successor is the mere continuation of the predecessor; or
4. the transaction is a fraudulent effort to avoid liabilities of the predecessor.

*Id.* at 412; s*ee also Gary Brown & Assoc., Inc. v. Ashdon, Inc*., Nos. 06-15262 & 07-10167 2008 WL 612672 (11th Cir. Mar. 7, 2008) (applying Florida law).

### A.   Express or Implied Assumption of Liability Exception

The first exception to the above traditional corporate law rule applies where there is an express or implied assumption of liability by the transferee.  The Florida Supreme Court stated that such an assumption is relatively straightforward, because "in an asset purchase, the liabilities and responsibilities of each party would be set forth in the parties' agreement."  *Corporate Express*, 847 So.2d at 412.  A finding of express or implied assumption is a traditional contract

analysis.[3] The analysis is – if, as part of the asset transfer transaction, the transfer is subject to the transferee's assumption of the liabilities of the transferor, the transfer of assets does in fact result in the transferee becoming the corporate successor of the predecessor corporation.

In applying state corporate law regarding the express or implied assumption of liability, federal courts are in substantial agreement today that CERCLA liability can be effectively transferred and assumed under a pre-CERCLA agreement where there is a clearly demonstrated intent in the document for the transfer and assumption of "all liability." *Aluminum Co. of Am. v. Beazer East, Inc.*, 124 F.3d 551, 566 (3d Cir. 1997) (pre-CERCLA liquidation agreement that provided that "[acquirer], for itself, its successors and assigns, fully intending to become legally bound thereby, does hereby assume all of the liabilities and obligations of [acquiree] of whatsoever nature" was sufficiently broad to permit the court to conclude that an assumption of CERCLA liabilities was effected); *United States v. Iron Mountain Mines, Inc.*, 987 F.Supp. 1233, 1241 (E.D. Cal. 1997) ("There are many precedents for the proposition that CERCLA liability can be assumed by a pre-CERCLA agreement so long as the agreement contains 'language broad enough to allow [a court] to say that the parties intended to transfer either contingent environmental liability, or all liability.'") (*citing John S. Boyd Co.*, 992 F.2d at 405 and *Beazer East, Inc. v. Mead Corp.*, 34 F.3d 206, 211 (3rd Cir. 1994) (emphasis added)); *HRW Sys., Inc. v. Washington Gas Light Company*, 823 F.Supp 318, 332-33 (D. Md. 1993) (In connection with dissolution of corporation, language in pre-CERCLA articles of transfer stating that Washington Gas "will assume all liabilities and obligations, liquidated and unliquidated, of the Transferor Corporation" was sufficient to permit the court to conclude that an assumption of

---

[3] Florida follows the standard rules of contract construction and looks specifically to the language of the agreement to determine the intent of the parties, giving effect to the unambiguous terms thereof. *E.g., Burns v. Barfield*, 732 So. 2d 1202, 1205 (Fla. 4th DCA 1999). Where the terms of a contract are unambiguous, the parties' intent must be determined from within the four corners of the document. *Id.*

CERCLA liabilities was effected). "Courts have universally held that language transferring 'all liabilities' is sufficiently broad to include environmental liability." *Iron Mountain*, 987 F.Supp. at 1241.

### B.    De Facto Merger / Mere Continuation Exceptions

The de facto merger and mere continuation exceptions to the traditional corporate law rule are equitable theories of successor liability favoring debt holders and are premised on the idea that a corporation may not cleanse itself of its liabilities simply by altering its corporate form. *Lab. Corp. of America v. Prof'l Recovery Network*, 813 So.2d 266, 269-270 (Fla. 5th DCA 2002) ("The imposition of liability upon a successor corporation is based on the notion that no corporation should be permitted to commit a tort or breach of contract and avoid liability through corporate transformation in form only"); s*ee also Murphy & King P.C. v. Blackjet, Inc.,* No. 13-80280-CIV-HURLEY, 2016 WL 3017224, at *13 (S.D. Fla. May 26, 2016) ("The rationale for imposition of successor liability in these circumstances is grounded on the notion that no corporation should be permitted to commit a tort or breach of contract and avoid liability through corporate transformations in form only.").

Though technically the de facto merger and mere continuation exceptions are distinct exceptions creating successor liability, the two are frequently used interchangeably by courts as a result of the similarity in the analysis conducted and facts required to find successor liability based upon either theory. *See North Shore,* 152 F.3d at 654 ("our analysis is a hybrid, in which we rely on both the rationale for the de facto merger exception and on the underlying basis of the mere continuation exception as well"); *see also Amjad Munim v. Azar*, 648 So.2d 145, 153-54 (Fla. 4th DCA 1995).

6

Florida courts have held that a de facto merger occurs where one corporation absorbs another corporation without formally complying with the statutory requirements for a merger. In analyzing whether the facts of a particular case constitute a de facto merger, Florida courts ask whether there is continuity of the transferring corporation evidenced by:

1. the same management, personnel, assets and physical location;
2. a continuity of the stockholders, accomplished by paying for the acquired corporation with shares of stock;
3. a dissolution of the selling corporation;
4. any other factors reasonably indicative of commonality or of distinctiveness.

*See Florio v. Manitex Skycrane, LLC*, No. 6:07-cv-1700-Orl-28KRS, 2010 WL 5137626, at *4 (M.D. Fla. Dec. 10, 2010) (*quoting Amjad Munim*, 648 So.2d at 153-54); *In re Metro Sewer Services, Inc. v. Nicassio Corp.*, 374 B.R. 316, 323 (M.D. Fla. 2007) (*quoting Lab. Corp.*, 813 So.2d at 270); *Orlando Light Bulb Serv., Inc. v. Browning*, 523 So. 2d 740, 743 (n. 1) (Fla. 5th DCA 1988) ("The bottom-line question is whether each entity has run its own race, or whether, there has been a relay-style passing of the baton from one to the other.").

Outside of the context of CERCLA, courts in Florida have recognized the continuity of stockholders as a factor in deciding whether a de facto merger has occurred.[4] *Florio*, 2010 WL 5137626, at *4; *Specialty National Insurance Company v. U-Save Auto Rental of America*, No. 8:07-cv-878-T-33MAP, 2009 WL 928040, at *9 (M.D. Fla. Apr. 2, 2009) ("To find a de facto

---

[4] The facts of the transactions at issue as discussed herein and in the City's Memorandum in Opposition to CHI's Amended MSJ (Doc. 296) ("City's Memorandum in Opposition to CHI's Amended MSJ"), incorporated herein by reference, make these cases easily distinguishable from this matter. While courts have considered the lack of continuity of shareholders and absence of an assets-for-stock form of transfer in finding no de facto merger occurred, more important to these courts were the underlying realities reflected by this lack of continuity (*i.e.* no mere continuation). In each case, a company sold the assets to an entirely separate and completely distinct entity under different ownership and control. *See Bernard*, 409 So.2d at 1048 (holding that successor-in-interest relationship did not exist where the old company sold its manufacturing business to a new company operating under different ownership and management); *Orlando Light*, 523 So.2d at 742–43 (holding that successor-in-interest relationship did not exist where alleged successor was separately owned and acquired only a limited amount of assets from alleged predecessor).

merger there must be continuity of the selling corporation evidenced by the same management, personnel, assets and physical location [and] a continuity of the stockholders.")  However, the *Specialty National* court went on to state that "the finder of fact may look to any other factors reasonably indicative of commonality or of distinctiveness."  *Specialty National*, 2009 WL 928040, at *9; *see also Orlando Light*, 523 So.2d at 742, n. 1.

Within the CERCLA context, at least one federal court has affirmatively determined that a de facto merger may be found even where the continuity of shareholders requirement is not met.  *Cytec Indus., Inc. v. B.F. Goodrich Co.*, 196 F.Supp.2d 644, 658 (E.D. Ohio 2002) ("A rule mandating the presence of all of the hallmarks of a de facto merger or always requiring an assets-for-stock transaction would be too rigid, as it would likely except some transactions that result in the dissolution of a predecessor corporation and that are in the nature of a total absorption of the previous business into the successor.") (internal quotations omitted); *see also Carrier Corp. v. Piper*, 460 F. Supp. 2d 827, 846 (W.D. Tenn. 2006) (in CERCLA case, citing the *Cytec Industries* test with approval).  Given the policy rationale for finding successor liability under CERCLA, a strict application of the continuity of the stockholders requirement is inappropriate where the facts otherwise support the finding of a de facto merger.

## V.    CHI IS THE CORPORATE SUCCESSOR TO JACKSONVILLE GAS COMPANY, THE SOLE OPERATOR OF THE MAIN STREET MGP

CHI is the corporate successor to Jacksonville Gas Company because CHI's predecessors expressly assumed Jacksonville Gas Company's liabilities.  Additionally, as discussed herein, CHI is liable in this case under the de facto merger and/or mere continuation exceptions as the successor to Jacksonville Gas Company.  While on the face of it, CHI's corporate history is a mind-numbing sequence of corporate mergers and reorganizations, the corporate history can be substantially simplified and easily understood by focused review of the relevant corporate

8

transactional documents and CHI's repeated representations to regulators, this court, purchasers of stock and insurers. The discussion below focuses on specific transactions in Jacksonville Gas Company's corporate history that CHI has stated constitute breaks in the corporate succession of Jacksonville Gas Company (CHI's Objections and Responses to The City's First Interrogatories Nos. 3-4)[5].

**A.    Jacksonville Gas Company was the Sole Operator of the Main Street MGP**

The Citizens Gas Light Company, a Florida corporation incorporated in 1874, owned and operated the Main Street MGP beginning in the 1870s. (CHI's Objections and Responses to JEA's Request to Admit ("CHI's Response to JEA's RFA") Nos. 1-2)[6]. Following a series of name changes,[7] the name of the corporate entity that operated the Main Street MGP became Jacksonville Gas Company in 1907. (City's Appendix Tab C, CHI's Response to City's RFA Nos. 7 and 9). Jacksonville Gas Company continued owning and operating the Main Street MGP until approximately 1912, when it moved its operations to a newly built MGP on a different site in Jacksonville. (*Id.* at No. 9). Thus, it is undisputed that Jacksonville Gas Company, first incorporated in 1874, was the sole owner and operator of the Main Street MGP during its entire operating history at the corner of Main Street and Orange Street.

---

[5] A true copy of City's First Set of Interrogatories to CHI and CHI's Objections and Responses to City's First Interrogatories are attached as a composite exhibit at Tab A in the City's separately filed Appendix to this Amended Motion ("City's Appendix").

[6] A true copy of JEA's Request to Admit to CHI ("JEA's RFA") and CHI's Response to JEA's RFA are attached as a composite exhibit at Tab B in the City's Appendix.

[7] The Citizens Gas Light Company changed its name to The Citizens Gas and Electric Company. The Citizens Gas and Electric Company changed its name to The Citizens Gas Company. The name of the Citizens Gas Company was then changed to Jacksonville Gas Company. *See* the City's Requests for Admissions to CHI ("City's RFA") and CHI's Responses and Objections to the City's RFA ("CHI's Response to City's RFA") Nos. 3, 5, and 7. A true copy of the City's RFA and CHI's Response to City's RFA is attached as a composite exhibit at Tab C in the City's Appendix.

**B.** **The 1927 Transaction did not Extinguish the Successor Liabilities Relating to the Main Street MGP - New Jacksonville Gas Company is Successor to Jacksonville Gas Company[8]**

On July 28, 1927, Jacksonville Gas Company was reincorporated as The Public Service Company of Jacksonville and changed its name to The Public Service Company of Jacksonville ("PSCJ").[9] On the same date July 28, 1927, a new Jacksonville Gas Company ("New Jacksonville Gas Company") was incorporated in Florida.[10] On the very next day, July 29, 1927, pursuant to an Indenture "made . . . by and between The Public Service Company of Jacksonville, a corporation, formally known as Jacksonville Gas Company, but reincorporated on the 28th day of July, 1927, under and pursuant to and by authority of Chapter 10096, Laws of Florida, Acts of 1925, under the changed name of The Public Service Company of Jacksonville . . . and Jacksonville Gas Company, a corporation incorporated on the 28th day of July, 1927, under and pursuant to and by authority of Chapter 10096, Laws of Florida, Acts of 1925," all of the assets of PSCJ were transferred to the New Jacksonville Gas Company in consideration of the assumption by the New Jacksonville Gas Company of "*all the liabilities* and obligations *of every kind and character* of [PSCJ].".[11] (emphasis added). The referenced assumption of *all the liabilities and obligations of every kind and character* is exactly the type of "straightforward"

---

[8] The 1927 transaction was partially the subject of CHI's Amended Motion for Summary Judgment on the City's Claims against CHI (Doc. 295) ("CHI's Amended MSJ"). The City fully briefed the 1927 transaction in the City's Memorandum in Opposition to CHI's Amended MSJ (Doc. 296). The City hereby references and incorporates into this Amended Motion the complete factual and legal analysis of the 1927 transaction provided in City's Memorandum in Opposition to CHI's Amended MSJ (Doc. 296).

[9] *See* Certificate of Reincorporation of Jacksonville Gas Company under the name of The Public Service Company of Jacksonville ("Certificate of Reincorporation") certified by the Florida Secretary of State attached as Tab D in the City's Appendix.

[10] *See* Certificate of Incorporation of Jacksonville Gas Company certified by the Florida Secretary of State attached as Tab E in the City's Appendix.

[11] *See* 7/29/1927 Indenture between The Public Service Company of Jacksonville and Jacksonville Gas Company certified by the Clerk of the Circuit and County Courts, Duval County, Florida (the "Indenture") attached as Tab F in the City's Appendix.

610512208.3

assumption of liability by a transferee that meets the first exception to the traditional corporate law rule applied in Florida. By virtue of the plain and unambiguous language of the Indenture, New Jacksonville Gas Company became and is the successor in interest to the Jacksonville Gas Company.

Additionally, CHI is also the successor in interest to Jacksonville Gas Company as evidenced by the fact that successor New Jacksonville Gas Company was the mere continuation of PSCJ/Jacksonville Gas Company. The nature of the business or businesses to be transacted by PSCJ (as provided in the Certificate of Reincorporation) is the exact same – *verbatim* -- nature of the business or businesses to be transacted by New Jacksonville Gas Company (as provided in the Certificate of Incorporation of successor Jacksonville Gas Company).[12] Pursuant to the Indenture, *all* assets were transferred – leaving PSCJ with no known assets or business to transact. Indeed, New Jacksonville Gas Company represented to the Florida Secretary of State in 1933 that PSCJ "went out of existence in July 1927 when the Jacksonville Gas Company was incorporated."[13] The entire corporate operations of the pre-1927 Jacksonville Gas Company were totally and completely absorbed by New Jacksonville Gas Company; the pre-1927 Jacksonville Gas Company, known after the name change as PSCJ, was left with nothing and went out of existence immediately. In accord with applicable case law, there was a complete "passing of the baton" in 1927 from Jacksonville Gas Company/PSCJ to New Jacksonville Gas Company. New Jacksonville Gas Company further confirmed this fact when it represented to

---

[12] *See* page 1 of the Certificate of Reincorporation attached as Tab D in the City's Appendix; *See also* page 1 of the Certificate of Incorporation of Jacksonville Gas Company attached as Tab E in the City's Appendix.

[13] *See* the August 10, 1933 letter from New Jacksonville Gas Company to The Florida Secretary of State stating that "Please be advised that The Public Service Company of Jacksonville went out of existence in July 1927 when the Jacksonville Gas Company was incorporated." This letter is part of attached Tab G in the City's Appendix, the Florida Department of State's complete file of PSCJ certified by the Florida Secretary of State on August 10, 2016.

610512208.3

*this very Court* in 1942 that it was incorporated under the Florida laws on July 28, 1927, as successor to a company of the same name incorporated in 1874.[14]

### C. The 1934-35 Bankruptcy of Successor New Jacksonville Gas Company did not have any effect on Corporate Successorship or the Liabilities related to the Main Street MGP

New Jacksonville Gas Company filed a petition for reorganization under the Bankruptcy Code in 1934.[15]  The purpose of the bankruptcy was specifically limited to restructuring certain interest payable to bondholders, debenture holders and preferred stockholders of the company. As provided in New Jacksonville Gas Company's Plan of Reorganization, only such bondholders, debenture holders and preferred stockholders were affected by the bankruptcy:

> The Bondholders and Debenture holders and Commonwealths Preferred Stock Claimants will be the only creditors of or claimants against the Company affected by the Plan.  Other creditors will be paid in cash in full by the Company in the ordinary course of business, subject to approval of the Court.

*Id.* at p. 2.  Similarly, the February 20, 1935 Order of the United States District Court for the Southern District of Florida approving the Plan ("February Order") describes the treatment of the

---

[14] *See* Appearance and Joinder filed on May 29, 1942 in Case No. 483J-Civil in The District Court of the United States for the Southern District of Florida sitting in Jacksonville ("Appearance and Joinder"), attached as Tab H in City's Appendix.  In the Appearance and Joinder, New Jacksonville Gas Company admits the allegations contained in the Application of the SEC to this Court (the "Application") to enforce the Plan Under Section 11(e) of the Public Utility Holding Company Act ("Plan") filed by New Jacksonville Gas Company with the SEC.  A copy of the Plan was attached to the Application and was specifically incorporated therein by reference.  In the Plan, New Jacksonville Gas Company states: "The present company [New Jacksonville Gas Company] was incorporated under the Florida laws on July 28, 1927, *as successor to a company of the same name incorporated July 14 [sic], 1874*."  The Plan is attached as Tab I in the City's Appendix.  The Plan was previously authenticated in CHI's Amended MSJ (Doc. 295) and CHI's Appendix referenced in CHI's Amended MSJ (Doc. 234) ("CHI's Appendix").  A copy of the Application (less exhibits) filed on May 29, 1942 in Case No. 483J-Civil in The District Court of the United States for the Southern District of Florida sitting in Jacksonville is attached as Tab J in the City's Appendix.  Both the Appearance and Joinder and the Application are self-authenticating (Rule 902(1) Fed. R. Evid).  Additionally, as necessary, the City requests that the Court, pursuant to Fed. R. Evid. 201(b), take judicial notice of the filing of both the Appearance and Joinder and the Application.

[15] *See* the 10/1/1934 Plan of Reorganization of Jacksonville Gas Company ("Plan of Reorganization") attached as Tab I to the CHI's Appendix (Doc. 234) and also attached at Tab K to the City's Appendix.  This is a document received by CHI from the National Archives at Atlanta, Georgia which holds records created by the U.S. District Courts in Florida.  *See* Tab B to the CHI's Appendix (Doc. 234).  This document was produced by CHI in this litigation and is authentic (Rules 901(7), (8), Fed. R. Evid.).

bondholders and stockholders under the Plan of Reorganization and states:

> And it appearing that *no other creditors of the Debtor are affected by said Plan . . . it is hereby ordered, adjudged and decreed that . . .*The Plan of Reorganization of the Debtor as presented at said final hearing as hereinafter modified be and the same hereby is approved and finally confirmed.[16] (Emphasis Added).

The bankruptcy did not result in the discharge of any claims.[17] The result of the bankruptcy proceedings simply "was to reduce the fixed interest rate on [New Jacksonville Gas Company's] then outstanding bonds, and to make part of its interest requirements upon said bonds, and all the interest upon its debentures and income notes, conditional upon earnings." *In re Jacksonville Gas Co.,* 46 F. Supp. 852, 856 (S.D. Fla. 1942). No other liabilities were addressed by the bankruptcy. Therefore, the 1934-1935 bankruptcy had no effect on corporate successorship or the liabilities in question related to the operation of the Main Street MGP.

### D. The 1942 Transaction did not Extinguish the Successor Liabilities Relating to the Main Street MGP - Jacksonville Gas Corporation is the Successor to Jacksonville Gas Company[18]

---

[16] *See* pp. 3 and 4 of the February Order attached to the City's Appendix at Tab L. The February Order is self-authenticating (Rule 902(1) Fed. R. Evid). Also, this is a document received by CHI from the National Archives at Atlanta, Georgia which holds records created by the U.S. District Courts in Florida. *See* Tab B to CHI's Appendix (Doc. 234). This document was produced by CHI in this litigation. This document is authentic (Rules 901(7), (8), Fed. R. Evid.). Additionally, as necessary, the City requests the Court, pursuant to Rule 201(b) Fed. R. Evid., to take judicial notice of the filing of the February Order.

[17] Nor could the bankruptcy, which occurred in 1934-35, discharge any CERCLA-related claims. CERCLA was not enacted until 1980, almost 45 years after the bankruptcy case was initiated and completed. Claims based on a statute enacted after a bankruptcy case is completed are generally not discharged. *See In re Penn Cent. Transp. Co.,* 944 F.2d 164 (3d Cir. 1991)(holding that a bankruptcy plan confirmed in 1978, two years before CERCLA was enacted, did not discharge a CERCLA claim because at the time of the Consummation Order there was no statutory basis for liability to be asserted because CERCLA has not yet become law). There is a narrow exception to the rule that claims based on a statute enacted after a bankruptcy case is completed are not discharged –where the statute does not create "new rights," but rather simply re-organizes or re-codifies existing rights. *See In re Chicago, Milwaukee, St. Paul & Pacific R.R Co.,* 3 F. 3d 200 (7th Cir. 1993). However, this narrow exception has never been successfully asserted regarding any CERCLA claim. *See In re Duplan Corp.,* 212 F.3d 144, 153 (2d Cir. 2000) (finding that CERCLA claims could not be discharged by a bankruptcy completed prior to the enactment of CERCLA).

[18] The 1942 transaction was partially the subject of CHI's Amended MSJ (Doc. 295). The City fully briefed the 1942 transaction in the City's Memorandum in Opposition to CHI's Amended MSJ (Doc. 296). The City hereby references and incorporates into this Motion the complete factual and legal analysis of the 1942 transaction provided in City's Memorandum in Opposition to CHI's Amended MSJ (Doc. 296).

In 1942, New Jacksonville Gas Company filed the Plan, seeking reorganization under the Public Utility Holding Company Act of 1935 ("PUHCA").[19]  Of relevance to the issues currently before this Court, Jacksonville Gas Company states in the Plan that "[t]he present company was incorporated under the Florida laws on July 28, 1927, *as successor to a company of the same name incorporated July 14 [sic], 1874*."[20] (emphasis added).  The Plan also provided that a newly formed corporation would "acquire all of the assets of Jacksonville Gas Company and assume all of its debts of every kind and character, excepting only the liabilities represented by the First Mortgage Bonds, the income debentures and the income notes."[21]

On May 28, 1942, the SEC issued its Findings and Opinion approving the Plan ("SEC Findings and Opinion"), finding, in part, that New Jacksonville Gas Company "was incorporated under the laws of Florida in 1927, as successor to a company of the same name incorporated in 1874."[22]  Additionally, in the SEC Findings and Opinion, the SEC determined that "[t]he new corporation would acquire all the assets of the present company [Jacksonville Gas Company] and would assume *all of its liabilities* except the presently outstanding first mortgage bonds, income debentures and income notes."  *Id.* at 3 and 4. (emphasis added).

By Order dated September 22, 1942, the United States District Court for the Southern District of Florida sitting in Jacksonville, Florida, approved the Plan.  *In re Jacksonville Gas Co.*, 46 F. Supp. 852 (S.D. Fla. 1942).  In that Order, the Court found, in part, that "the [P]lan contemplates that a new corporation be formed, to acquire all the assets of the present company

---

[19] 15 U.S.C. § 79 *et seq.* (repealed 2005).

[20] *See* page 1 (547) of the Plan attached as Tab I in the City's Appendix.

[21] *See id.* at page 7 (553).

[22] *See* page 2 of the SEC Findings and Opinion attached as Tab M in the City's Appendix (previously attached as Tab Q in CHI's Appendix (Doc. 234)).

and to *assume all its obligations* except the presently outstanding first mortgage bonds, income debentures, and income notes." *Id.* at 857 (emphasis added). The Court also noted that an Order of enforcement would issue. *See id.* at 860. Thereafter, on October 14, 1942, the Court entered its Order adopting the September 22, 1942 Order as its findings of facts and conclusions of law.[23] Of note, in the October Order, the Court "authorized and directed" Jacksonville Gas Company to form Jacksonville Gas Corporation[24] and, in part, to "[c]ause Jacksonville Gas Corporation to assume *all of the liabilities* of Jacksonville Gas Company, except the presently outstanding first mortgage bonds, income debentures and income notes of Jacksonville Gas Company . . .." *Id.* at p. 4 (emphasis added). Upon such transfer and assumption, New Jacksonville Gas Company ceased to exist.

Given Jacksonville Gas Corporation's express assumption of liabilities of the New Jacksonville Gas Company, there really is no need to evaluate the "de facto" or "mere continuation" theories of successor liability. Nevertheless, a hybrid analysis of the de facto and mere continuation theories, as performed by the Court in *North Shore Gas,* would also establish that the liabilities of New Jacksonville Gas Company transferred to Jacksonville Gas Corporation and would satisfy those exceptions to the traditional corporate law rule. This analysis was provided in detail in the City's Memorandum in Opposition to CHI's Amended MSJ and is incorporated herein by reference. *See* City's Memorandum in Opposition to CHI's Amended MSJ, pages 16 -20.

---

[23] *See* the 10/14/42 Order issued in Case No. 483J-Civil in The District Court of the United States for the Southern District of Florida ("October Order") attached as a Tab N in the City's Appendix (previously attached as Tab O in CHI's Appendix (Doc. 234)).

[24] Jacksonville Gas Corporation was formed and incorporated in 1943. *See* the Articles of Incorporation, as amended, of Jacksonville Gas Corp. certified by the Florida Secretary of State, at Tab P in the City's Appendix.

**E.     The 1962 Merger did not Extinguish the Successor Liabilities Relating to the Main Street MGP - The Houston Corporation/Florida Gas Company Assumed all Liabilities of Jacksonville Gas Corporation**

On March 16, 1962, an Agreement of Merger was entered between Jacksonville Gas Corporation and The Houston Corporation, a Florida corporation.[25]   (City's Appendix Tab C, CHI's Response to City's RFA No. 24).   Under longstanding precedent, on the date of a merger the surviving corporation becomes liable for all the liabilities of and obligations of the former corporation.  *See Corporate Express*, 847 So.2d at 413 (*citing Barnes v. Liebig*, 146 Fla. 219, 1 So. 2d 247, 253 (Fla. 1941); *citing* § 607.1106, F.S (2002); and *citing* §§ 607.1106 and 607.231(3), F.S. (1987)).   Accordingly, by virtue of the merger, The Houston Corporation, which then changed its name to Florida Gas Company ("FGC") in June 1962, assumed all liabilities of Jacksonville Gas Corporation. (City's Appendix Tab C, CHI's Response to City's RFA Nos. 26 and 27).

**F.     1979 Transactions did not Extinguish the Successor Liabilities Relating to the Main Street MGP**

In 1979, FGC changed its name to Continental Resources Company ("CRC").  (*Id.* at No. 31).   CRC was thereafter liquidated pursuant to a plan of liquidation that is reflective in certain operative documents that were executed contemporaneously with the liquidation of CRC.  These documents evidence the express assumption of FGC's liabilities (first by Continental Exploration Company ("CEC") and, immediately thereafter, by Florida Energy Holdings Company

---

[25] *See* March 16, 1962 Agreement of Merger between Jacksonville Gas Corporation and The Houston Corporation ("1962 Agreement of Merger") certified by the Florida Secretary of State attached as Tab O in the City's Appendix. Additionally, as noted in the letter that is part of the certified copy of the 1962 Agreement of Merger, simultaneous with the filing of the 1962 Agreement of Merger with the Florida of Secretary of State, a new Florida corporation, also named Jacksonville Gas Corporation, was formed "in order that the name Jacksonville Gas Corporation remains available."  The "old" or first Jacksonville Gas Corporation that merged into The Houston Corporation (as later discussed in this Amended Motion) is the entity that was formed as successor to Jacksonville Gas Company and is the entity that became CHI.

("FEHC")) and constitute CRC's compliance with applicable Florida Statutes in connection with the dissolution of that entity under Florida law.[26]

The first operative document is the Unanimous Consent of Board of Directors of CRC (formerly FGC) ("CRC"), dated November 28, 1979, which was executed by the Board of Directors of CRC (Robert S. Hatfield, Donald J. Donahue, S. Bruce Smart, Jr., and Selby W. Sullivan ("CRC Board") )("CRC Unanimous Consent")[27]. In the CRC Unanimous Consent, the CRC Board formulated a plan of liquidation and dissolution for CRC. *See id.* The plan of liquidation and dissolution adopted by the CRC Unanimous Consent expressly provided for the assets of CRC to be distributed to the shareholders of CRC and, more importantly, for the assumption of liabilities by CEC, as follows:

   i) to [The Continental Group Inc.], owner of 16% of the issued and outstanding capital stock of [CRC], the capital stock of [Sugar Mill Estates] and [Florida Land Company] plus cash in an amount necessary, when added to such stock valued as aforesaid, to equal $56,145,540 [sic], and

   ii) to [CEC], owner of 84% of the issued and outstanding capital stock of [CRC], all of [CRC's] other assets and properties, including, without limitation, land, improvements, fixtures, leaseholds, furniture, equipment, inventory, supplies, receivables, contract rights, securities, causes of action, franchise rights, licenses and goodwill, with *CEC assuming all the liabilities and obligations of [CRC],* in all respects, including, without limitation, all payables, tax liabilities, contractual liabilities, and liabilities arising from litigation, whether based on contract or in tort, and relating to the assets or liabilities transferred to CEC.

*Id.* at 3 (emphasis added).

The language of the CRC Unanimous Consent is an unambiguous expression of the plan of liquidation of CRC, which contemplated the initial assumption by CEC of *all* of the liabilities

---

[26] Florida law in effect in 1979 required that, prior to dissolution, a corporation shall "satisfy or discharge its liabilities and obligations or make adequate provision for payment and discharge thereof." § 607.261 and § 607.267, Florida Statutes (1979).

[27] *See* the 11/28/79 CRC Unanimous Consent attached as Tab Q in the City's Appendix. The CRC Unanimous Consent was authenticated by CHI. *See* City's Appendix Tab C, CHI's Response to City's RFA No. 34.

and obligations of CRC. The clear intent of the CRC Board was to distribute certain select assets to The Continental Group, Inc., while the remainder of the assets were to be transferred to CEC, with CEC initially assuming *all* liabilities and obligations. CEC, upon such transfer, became the initial successor to CRC (albeit only momentarily, as is shown below).

The second operative transfer document in connection with the CRC plan of liquidation is the Unanimous Consent of Board of Directors of FEHC, the parent corporation of CEC, which is also dated November 28, 1979, and was executed simultaneously with the CRC Unanimous Consent by the Board of Directors of FEHC (Robert S. Hatfield, Donald J. Donahue, S. Bruce Smart, Jr., Selby W. Sullivan ("FEHC Board") ("FEHC Unanimous Consent")[28]. In the FEHC Unanimous Consent, the FEHC Board resolved:

> that [FEHC], as sole stockholder of CEC, hereby approves a plan pursuant to which CEC will transfer and assign to [FEHC] all of its right and title to, and interest in, *all of the assets, rights and property received by CEC in the liquidation of Continental Resources Company (Florida)*, with the exception of any assets, rights or property formerly owned by Florida Exploration Company [a wholly owned subsidiary of CRC] and the stock of Ocelot Oil Company [a wholly owned subsidiary of CGI], and that [FEHC] *assume all liabilities and obligations related to such assets, rights and property.*

*Id.* at 2-3 (emphasis added). The FEHC Board executed this document at the same time that the CRC Board, consisting of the same individuals, executed the CRC Unanimous Consent.

The explicit language of the FEHC Unanimous Consent clearly states that "all of the assets, rights and property received by [CEC] in the liquidation of Continental Resources Company (Florida)" will be transferred to FEHC, *with the exception of two specific assets* (i.e. any assets, rights or property of Florida Exploration Company and the stock of Ocelot Oil

---

[28] *See* the 11/28/79 FEHC Unanimous Consent attached as Tab R in the City's Appendix. The FEHC was authenticated by CHI. *See* City's Appendix Tab C, CHI's Response to City's RFA No. 37.

Company).[29]  After expressly providing that these two specifically named assets were to remain with CEC, the FEHC Unanimous Consent then provided that "*all* of the assets, rights and property received by CEC in the liquidation of Continental Resources Company (Florida)" would be assigned to FEHC and that FEHC expressly assumed "*all liabilities and obligations* related to such assets, rights and property."[30] (emphasis added)

Because the CRC Unanimous Consent and FEHC Unanimous Consent were executed at the same time by the same individuals, immediately prior to the liquidation of CRC (formerly FGC), it is apparent that the two documents, taken together, constitute the plan for CRC's liquidation.  Indeed, CHI has actually detailed the plan of liquidation described herein to this very Court in 1991 in the matter of *Container Corp. of America v. Kiewit Cont'l, Inc.*, Case No. 90-887-CIV-J-14.  In that case, on August 7, 1991, Kenneth Gaskins, Vice President and Corporate Counsel to CHI, swore to an affidavit addressing the corporate history of CHI, including the 1979 liquidation of CRC (the "Gaskins Affidavit").[31] In the Gaskins Affidavit, Mr. Gaskins states that:

B.   . . . on or about August 28, 1979, Florida Gas Company changed its name to Continental Resources Company ("[CRC]". . .

C.   On or about November 28, 1979 [CRC] liquidated and distributed part of its assets to The Continental Group, Inc. with the remaining assets and *all* of the liabilities being distributed and transferred to [CEC] . . .

D.   In conjunction with the above transaction, [CEC], transferred most of its

---

[29] *See* p. 2, FEHC Unanimous Consent attached as Tab R in the City's Appendix; *See also* City's Appendix Tab C, CHI's Response to City's RFA No. 36 admitting that the transfer occurred.

[30] *See* pp. 2-3, FEHC Unanimous Consent attached as Tab R in the City's Appendix.

[31] *See* the Gaskins Affidavit attached as Tab S in the City's Appendix.  CHI has authenticated the Gaskins Affidavit. *See* City's Appendix Tab C, CHI's Response to City's RFA No. 42.  Furthermore, the Gaskins Affidavit is self-authenticating (Rule 902(1) Fed. R. Evid).  Additionally, as necessary, the City requests the Court, pursuant to Rule 201(b) Fed. R. Evid., to take judicial notice of the filing of the Gaskins Affidavit.

assets and *all* of its liabilities received in the liquidation of [CRC[ to [FEHC], a second tier subsidiary of The Continental Group, Inc., which thereafter changed its name to Continental Resources Company . . .

*See id.* at 2-3 (emphasis added).

As outlined above and described under oath by CHI to this Court in 1991, the plan of liquidation effectively accounted for all of CRC's (formerly FGC's) liabilities. The CRC Unanimous Consent and the FEHC Unanimous Consent both use the phrase "all liabilities and obligations" when describing the nature of the liabilities and obligations provided for in the plan of liquidation of CRC. *See id.* Such language is sufficiently broad to support a finding that FEHC assumed CRC's (formerly, FGC's) CERCLA liability. *White Consol. Indus., Inc. v. Westinghouse Elec. Corp.*, 179 F.3d 403, 409 (6th Cir. 1999) (language stating that Purchaser "hereby assumes . . . all obligations and liabilities of the Business, contingent, or otherwise" was sufficient to permit court to conclude that an express assumption of CERCLA liabilities was effected); *Iron Mountain Mines, Inc.*, 987 F.Supp. at 1241 ("Courts have *universally* held that language transferring 'all liabilities' is sufficiently broad to include environmental liability.") (emphasis added). The CRC Unanimous Consent and the FEHC Unanimous Consent confirm that the receiving corporate entities were assuming all liabilities, with FEHC being the ultimate destination of such liabilities in the plan of liquidation of CRC (formerly FGC).

In addition to being liable through FEHC's express assumption of liability, liability is also established under the theory of de facto merger. There are several key facts in the present case that, considering applicable Florida law when viewed in light of the policy underlying CERCLA, support a determination that the effect of the November 29, 1979 assignment of CRC assets to FEHC, and the assumption of CRC liabilities by FEHC, was to merge CRC into FEHC without following the statutory formalities of merger. These include: the same management, personnel, and assets; a dissolution of the selling corporation; and the following numerous

20

factors indicative of commonality: [32]

1. FEHC was incorporated as a Florida corporation on November 15, 1979[33], just two weeks prior to the liquidation of CRC and the transfer of CRC's assets to FEHC and FEHC's assumption of CRC's liabilities.

2. Prior to assuming the CRC assets and liabilities, and continuing the business operations of CRC, it does not appear and there has been no evidenced proffered that FEHC had any business operations or business purpose.

3. CEC, the 84% stockholder of CRC, was the wholly-owned subsidiary of FEHC.

4. On November 28, 1979, the FEHC Board was comprised of Robert S. Hatfield, Donald J. Donahue, S. Bruce Smart, Jr. and Selby W. Sullivan, the exact same individuals who made up the CRC Board.

5. As part of CRC's plan of liquidation, CRC changed its name to Resources Liquidating Corp., and, thereafter, dissolved on December 28, 1979. [34]

6. Upon the transfer of CRC's assets to, and the assumption of CRC's liabilities by, FEHC, FEHC changed its name to Continental Resources Company and held itself out to the public as Continental Resources Company, the same name as its predecessor entity.[35]

Such facts are more than adequate to permit a court applying Florida law in the context of CERCLA to find that on November 28, 1979, FEHC became the corporate successor to CRC (formerly, FGC) by virtue of its de facto merger with such entity. As a result, FEHC succeeded to FGC's CERCLA liability for the Main Street MGP based on both the express assumption of liability and the de facto merger/mere continuation exceptions to the general corporate law rule

---

[32] At least one federal court has held that a de facto merger may be found even where the continuity of shareholders requirement is not met. *B.F. Goodrich Co.*, 196 F.Supp.2d at 658.

[33] *See* 11/14/79 Articles of Incorporation of FEHC attached as Tab T in the City's Appendix. The Articles of Incorporation of FEHC were authenticated by CHI. *See* City's Appendix Tab B, CHI's Response to JEA's RFA No. 14.

[34] *See* City's Appendix Tab B, CHI's Response to JEA's RFA Nos. 13, 17, and 22; Articles of Dissolution of Resources Liquidating Corp. certified by the Florida Secretary of State attached as Tab U in the City's Appendix.

[35] *See* City's Appendix Tab C, CHI's Response to City's RFA Nos. 43 and 44. *See also* Articles of Amendment of FEHC wherein FEHC changed its name to Continental Resources Company. The Articles of Amendment of FEHC were authenticated by CHI. *See* City's Appendix Tab C, CHI's Response to City's RFA No. 44.

on successor liability. CHI then succeeded to such liabilities by virtue of the vertical mergers of several Continental entities ultimately into CHI.

### G. Post 1979 Transactions, Including 1984 Transactions, did not Extinguish the Successor Liabilities Relating to the Main Street MGP—FEHC Becomes CHI

Upon the transfer of CRC's assets to, and the assumption of CRC's liabilities by FEHC, FEHC changed its name to Continental Resources Company. In 1982, Continental Resources Company changed its name to Continental Group Resources Company.[36] Then, in September 1984, Continental Group Resources Company merged into its parent company, Continental Energy Corporation.[37] The Gaskins Affidavit confirms these facts, specifically that Continental Resources Company (formerly FEHC) "was merged into its parent Continental Energy Corporation, a Virginia corporation, which, in turn, on September 24, 1984, merged into The Continental Group, Inc. ["CGI"].

CHI asserts that, in September 1984, prior to its merger with Continental Energy Corporation, Continental Group Resources Company (formerly FEHC) transferred its liabilities, including all of FGC's liabilities, to CRC Management Company. The City disagrees with CHI's assertion that such FGC liabilities were effectively transferred. While CERCLA allows for a responsible party to transfer its liability to a third party, such transfer only affects the rights of the two parties to such transfer. CERCLA does not allow for such a transfer to defeat the transferor's CERCLA liabilities to third parties. *See North Shore*, 152 F.3d at 653; *Harley-Davidson, Inc. v. Minstar, Inc.*, 41 F.3d 341, 343-44 (7th Cir. 1994) ("[W]e agree with every other appellate court that has been called on to interpret [§107(e)] that it does not outlaw

---

[36] *See* City's Appendix Tab C, CHI's Response to City's RFA Nos. 45 and 46.

[37] *See id.* at Nos. 47 and 48.

indemnification agreements, but merely precludes efforts to divest a responsible party of his liability." (*citing John S. Boyd*, 992 F.2d at 405 and *United States v. Hardage*, 985 F.2d 1427, 1433 (10th Cir. 1993)).

After the September 1984 merger of Continental Group Resources Company into Continental Energy Corporation, Continental Energy Corporation then merged into its parent, The Continental Group, Inc.[38]  In November 1984, The Continental Group, Inc. merged into KMI Continental Inc., with the surviving corporation being KMI Continental Inc.[39]  In August 1986, KMI Continental Inc. merged with Kiewit Investment Corporation, and the name of KMI Continental Inc. was therein changed to Kiewit Continental Inc.[40]  In June 1990, Kiewit Continental Inc. merged into Continental Holdings, Inc., with the surviving corporation being Continental Holdings Inc.[41]  In February 1991, Continental Holdings Inc. changed its name to Continental Can Europe, Inc.[42]  In September 1991, Continental Can Europe, Inc. changed its

---

[38] *See id.* at Nos. 49 and 50.

[39] *See id.* at Nos. 51 and 52; *See* also the Affidavit of Peggy Menchaca, a Vice President and Corporate Secretary of Houston Pipe Line Company ("HPL") filed in the matter of *Container Corp. of America v. Kiewit Continental, Inc.*, Case No. 90-887-CIV-J-14, in the District Court for the Middle District of Florida ("Menchaca Affidavit") attached as Tab V to the City's Appendix.  The Menchaca Affidavit is self-authenticating (Rule 902(1) Fed. R. Evid). Additionally, as necessary, the City requests the Court, pursuant to Rule 201(b) Fed. R. Evid., to take judicial notice of the filing of the Menchaca Affidavit.  Attached to the Menchaca Affidavit are stock certificates wherein KMI Continental Inc. sells, assigns, and transfers stock to entities "as successor in interest to [FGC], which was acquired by merger into The Continental Group, Inc. as of August 28, 1979 and by the merger of The Continental Group, Inc. into KMI Continental Inc. as of November 1, 1984."  *See also* the City's First Amended Request for Admission to HPL and HPL's Responses and Objections to the City's First Amended Request for Admission, attached as a composite exhibit at Tab W in the City's Appendix, wherein HPL makes several admissions relating to the Menchaca Affidavit.

[40] *See* Certificate of Merger of Kiewit Investment Corporation into KMI Continental Inc. Under Section 904 of the New York Business Corporation Law Articles certified by the New York Department of State attached as Tab X in the City's Appendix wherein KMI Continental Inc. changes its name to Kiewit Continental Inc.

[41] *See* City's Appendix Tab C, CHI's Response to City's RFA Nos. 54 and 55; *See Id.* at No.60 wherein CHI admits that it is the same corporation that survived the June 1990 merger.

[42] *See id.* at. 56 and 57.

name to Continental Holdings Inc.[43]  By virtue of the mergers and name changes outlined above, CHI assumed all of the liabilities of FGC, including liability under CERCLA for the acts of its predecessor, Jacksonville Gas Company.

> **H.** **CHI Represented to Insurers of Jacksonville Gas Corporation/Florida Gas Company that CHI is the Successor to Jacksonville Gas Corporation/Florida Gas Company for Pollution Resulting from the Operation and Dismantling of MGPs Operated by Jacksonville Gas Corporation/Florida Gas Company**

Finally, CHI has represented to various insurance companies that issued policies to Jacksonville Gas Corporation/FGC that CHI is the successor to FGC.[44]  Such representations include, among others: 1) in a May 1, 2002 letter to Lloyds of London, CHI represented that "Continental has been designated as a successor in interest to Florida Gas because mergers made Florida Gas a Continental subsidiary. The first Agreement of Merger was entered into in June of 1979."; 2) in a June 29, 2005 letter to The Hartford,  CHI represented that it was "providing the enclosed documents regarding the relationship between Florida Gas Company ("FGC") and Continental Holdings, Inc. ("CHI") as a corporate successor to FGC", and CHI further advised that CHI would provide additionally requested cost documentation to The Hartford "once Hartford acknowledges that CHI is a successor to FGC and may be entitled to insurance

---

[43] *See id.* at Nos. 58 and 59.

[44] *See* the January 5, 2016 deposition of David Isabel at 106 attached as Tab Y in the City's Appendix wherein Mr. Isabel states that he was authorized by CHI as counsel to transmit a document to insurance carriers that "was being submitted as a notice of claims of environmental damages being made against CHI because of its acquisition of Florida Gas Company in 1979.";  *See* also the composite exhibit attached at Tab Z in the City's Appendix, which consists of a selection from the numerous insurance claims letters and/or CHI's responses to requests by insurers for information relating to CHI's corporate history produced by CHI after Mr. Isabel's deposition and in response to the June 23, 2016 order of the Court in this litigation.; *See also* Tab AA in the City's Appendix, a copy of the March 20, 2007 letter from CHI to Resolute Management Inc. ("RMI") regarding FGC insured sites in Florida, including Jacksonville, and providing 23 documents regarding "the relationship between Florida Gas Company ("FGC") and Continental Holdings, Inc. ("CHI") . . ." and 2 documents regarding "the relationship between Jacksonville Gas Corporation and Florida Gas Company."  Given that CHI, in 2007, provided RMI. with such documents, many of which are the very documents we rely on in this Amended Motion, it is not surprising that RMI in the December 5, 2016 correspondence from RMI as "the third-party administrator responsible for certain hazardous waste claims on behalf of Lamorak Insurance Company ("Lamorak"), formerly known as OneBeacon America Insurance Company", a copy of which is attached as Tab BB in the City's Appendix, advised that specific insurance policies issued to FGC had been fully released and that Lamorak believes that "CHI was and is, in fact, the successor to Florida Gas."

coverage under certain policies issued to FGC by Hartford; 3) in a June 6, 2006 letter to The Hartford, CHI represented that it was providing additional documents in response to The Hartford's "request for information on the relationship between Jacksonville Gas Corporation and Florida Gas Company."; and 4) in a May 15, 2006 letter to Zurich Insurance Company, CHI represented that it was responding to Zurich's "various requests" for documents regarding "Continental Holdings, Inc." ("CHI") claims related to certain former manufactured gas plant sites located in Florida" and provided documents regarding the "corporate relationship between Florida Gas Company ("FGC") and CHI." (*See* Composite exhibit attached at Tab Z in the City's Appendix). In claiming that it is not the corporate successor to FGC, CHI contradicts its multiple written representations and the supporting documents CHI provided to sophisticated insurance companies just a decade ago which resulted in the release of FGC policies and the payment of CHI under certain FGC insurance policies.[45]

## VI.  CONCLUSION

CHI is the corporate successor to and is obligated for the liabilities of Jacksonville Gas Company, the sole operator of the Main Street MGP.[46] CHI's admissions and representations and the corporate documents referenced herein definitively establish that as a matter of law CHI is the corporate successor to Jacksonville Gas Company. As such, the City requests this Court grant this Amended Motion and find CHI, for purposes of CERCLA and Section 376.313, F.S., is the corporate successor to Jacksonville Gas Company, the sole owner and operator of the Main Street MGP.

---

[45] See Tab BB in the City's Appendix, the December 5, 2016 correspondence from RMI to Ethan Loeb; See also Tab CC in the City's Appendix, an April 30, 2009 check from RMI to CHI, as the "claimant" on a specific insurance policy where "Florida Gas" was the "insured."

[46] *See* Tab DD in the City's Appendix, a flow chart depiction of the corporate successor facts outlined in this Amended Motion.

Respectfully submitted this 27th day of March, 2017.

/s/ William L. Pence
William L. Pence (FL Bar No. 298271)
Michael S. Vitale (FL Bar No. 17136)
Kristina R. Ramsey (FL Bar No. 629839)
**BAKER & HOSTETLER LLP**
200 South Orange Avenue, Suite 2300
Orlando, Florida 32801
Telephone:  407-649-4083
Facsimile:  407-841-0168
wpence@bakerlaw.com
mvitale@bakerlaw.com
kramsey@bakerlaw.com

- and -

OFFICE OF GENERAL COUNSEL
City of Jacksonville
Jason R. Teal (FL Bar No. 157198)
Deputy General Counsel
Michael B. Wedner (FL Bar No. 287431)
Senior Assistant General Counsel
117 West Duval Street, Suite 480
Jacksonville, Florida 32202
Telephone:  904-630-1834
JTeal@coj.net
mwedner@coj.net

*Attorneys for Plaintiff, The City of Jacksonville*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of March 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send an electronic copy to the following:

| | |
|---|---|
| Mary C. Sorrell<br>sorrell@fdn.com<br>**MARY C. SORRELL, P.A.**<br>P.O. Box 330108<br>Atlantic Beach, FL 32233<br><br>*Attorneys for Defendant, Shoppes of Lakeside, Inc.* | James C. Rinaman, III<br>jrinaman@rinamanlaw.com<br>**JAMES C. RINAMAN, III & ASSOCIATES, P.A.**<br>1054 Kings Avenue<br>Jacksonville, FL 32207<br><br>*Attorneys for Defendant, Jacksonville Hospitality Holdings, L.P.* |
| Tim E. Sleeth<br>tsleeth@smithhulsey.com<br>Stephen D. Busey<br>sbusey@smithhulsey.com<br>John R. Thomas<br>jthomas@smithhulsey.com<br>**SMITH HULSEY & BUSEY**<br>225 Water Street, Suite 1800<br>Jacksonville, FL 32202<br><br>*Attorneys for Defendant, Continental Holdings, Inc.* | George F. Gramling III<br>george@gramlinglaw.com<br>**GRAMLING ENVIRONMENTAL LAW, P.A.**<br>118 South Newport Avenue<br>Tampa, FL 33606<br><br>*Attorneys for Third Party Defendants, Houston Pipe Line Company, L.P. and HPL GP, LLC* |
| Scott R. Alexander<br>salexander@taftlaw.com<br>R. William Gardner<br>wgardner@taftlaw.com<br>**TAFT STETTINIUS & HOLLISTER LLP**<br>One Indiana Square, Suite 3500<br>Indianapolis, IN 46204<br><br>*Attorneys for Third Party Defendants, Houston Pipe Line Company, L.P. and HPL GP, LLC* | Ethan J. Loeb<br>ethanl@smolkerbartlett.com<br>susanm@smolkerbartlett.com<br>Jon P. Tasso<br>jont@smolkerbartlett.com<br>cynthiam@smolkerbartlett.com<br>**SMOLKER, BARTLETT, LOEB, HINDS & SHEPPARD, P.A.**<br>100 North Tampa Street<br>Suite 2050<br>Tampa, FL 33602<br><br>*Attorneys for Third Party Defendants, Houston Pipe Line Company, L.P. and HPL GP, LLC* |

610512208.3

| | |
|---|---|
| William L. Pence<br>wpence@bakerlaw.com<br>Kristina R. Ramsey<br>kramsey@bakerlaw.com<br>Michael S. Vitale<br>mvitale@bakerlaw.com<br>**BAKER & HOSTETLER LLP**<br>200 South Orange Avenue, Suite 2300<br>Orlando, FL 32801<br><br>*Attorneys for Plaintiff, The City of Jacksonville, and Third-Party Defendant, JEA* | Jason R. Teal<br>Deputy General Counsel<br>JTeal@coj.net<br>Michael B. Wedner<br>Senior Assistant General Counsel<br>mwedner@coj.net<br>OFFICE OF GENERAL COUNSEL<br>**CITY OF JACKSONVILLE**<br>117 West Duval Street, Suite 480<br>Jacksonville, FL 32202<br><br>*Attorneys for Plaintiff, The City of Jacksonville, and Third-Party Defendant, JEA* |

*/s/ William L. Pence*
William L. Pence